We're ready for argument in our first case, Hodgin v. UTC. Mr. Donovan. Good morning. May it please the court, Brian Donovan on behalf of the appellants. And I'm honored to be here for the first time today. Thankfully, my task this morning is not particularly complicated. The appellants make just two assignments of error. First thing I hope to talk about this morning is how the district court erred as a matter of law in concluding that precarious liability through ratification requires a preexisting agency relationship. The district court's conclusion in that regard is contrary to the governing restatement, contrary to every federal court to apply that restatement, contrary to Judge Keeley's denial of summary judgment on the same issue when she presided over the case, and remarkably, contrary to Judge Bailey's own conclusion on the same issue in another TCPA vicarious liability case that was decided just a few months after the case on appeal. The second thing I'd like to discuss today is how the district court jumped the gun by awarding summary judgment with six months left in the court's scheduling order for discovery and over counsel's proper 50-60 affidavit. If we agree with you on the merits of the first issue, that is that the judge was mistaken as to the agency question, do we need to decide this discovery issue? No, Your Honor. You don't need to decide it because if you ruled with us on ratification, we would go back to the district court and proceed on that. However, we would like for you to decide it because it wouldn't be rendered moot. At the district court level, at the MDL, the plaintiffs proceeded on three theories of vicarious liability. We had an actual implied agency theory, an apparent agency theory, and a ratification theory. Now, in terms of those theories individually, we're here today only challenging the district court's error in its ratification rule. However, the fact that the court cut off discovery early with the 56D issue, cut off our chance to take further discovery pertinent to the actual implied agency theory and to the apparent agency theory. Well, I thought, and maybe I'm misunderstanding the record, but I thought discovery was cut off simply with respect to summary judgment motions, not with respect to continued discovery prior to trial. Am I wrong about that? Well, Your Honor, when the court entered summary judgment, it was complete with respect to all of them. Am I understanding the court's question correctly? Well, I guess, as I understood it, there was still some time left in the schedule for discovery, and the court in this instance denied discovery on the grounds that you delayed with respect to taking it as to the motions for summary judgment. But I don't know that that certainly precludes you from taking continued discovery up until the moment of trial unless the judge enters a different order. And I don't want to get- I understand the court's question now, Judge Diaz. I do think that we would ask if, for example, the court wrote an opinion on the ratification issue and sent it back to Judge Bailey, I think it would be our position that we would be allowed to continue doing discovery up until trial. However, I do think it would be helpful perhaps for the circuit court to clarify that issue. Could you help me with what has to be your ratification argument? Is there any evidence that the telemarketer's use of prerecorded messages, which mention HCC and Honeywell, created a net benefit? Yes, Your Honor. Can you quantify that for me? Sure. I understand that your theory is that there may have been some somewhat ephemeral benefit from the use of the name, but can you show that there was a benefit from the use of the calls that UTC and Honeywell were aware of? Yes, we can, Your Honor. These deals were moving, I think the record indicates, between $2 and $3 million worth of product on an annual basis. Right. We have a long way to go, though, before we get to net benefit. I understand that. That's the universe. Yes, Your Honor. If ISI and VMS are not out there making telemarketing calls and selling these monitoring contracts, for which they're compensated by Monotronics, who's the monitoring company, they're not buying these products from Honeywell and UTC. Maybe the answer to my question is no. What you're telling me is that you're inferring that these downstream people referred to the upstream supplier in a prerecorded call suggests that some benefit inured, but you can't quantify it? I think it can absolutely be quantified. Okay. Every single time that VMS or ISI successfully sells a monitoring contract, they are selling... I'm sorry, I'm interrupting you and I apologize. That's fine, Your Honor. Go ahead. It's kind of a legal thing. Every time that VMS or ISI sells a monitoring contract, they are selling a Honeywell or UTC security system. Okay. This authorized dealer model that works together, UTC and Honeywell, they're not selling these products directly to consumers. The only way that they're getting these products into consumers' homes and the only way that UTC... In fact, I would say not only is there a quantifiable benefit, the only benefit they're getting from this is from these telemarketing calls. That's the only way that these UTC and Honeywell security systems are being sold and put into homes at all. So you're saying the distributors don't pay the manufacturer anything? Distributors do pay the manufacturer. Okay. Well, then you were saying that was the only source of revenue. I think you need to be a little more precise. Maybe it would be helpful if you could, in answering the question, give us the structure. Sure. I mean, we know we have the manufacturer, we know we have the distributor, we know we have end users, and then we have the authorized dealers. And it was difficult to tell from the brief whether that's it. You have these four tiers or are there sometimes more tiers? So in answering the question, if you could also keep that in mind. Thank you, Judge Keenan. I'll do my very best. It is admittedly somewhat of a complicated model, but it's important to understand as background how closely all of these entities work together. These are entities that are communicating with one another, working with one another on a daily basis, sharing marketing advice, sharing marketing budgets, sharing marketing scripts. So you have the manufacturers, Honeywell and UTC. They manufacture the products. They don't sell those products in a store. They don't sell those products in a catalog. Maybe they do, but not as relevant to the model that's happening in this case. The way that they're selling those products in this case is that they have a network of authorized dealers. Those authorized dealers work very closely with Monotronics and UTC, and Monotronics and UTC does everything that it can to incentivize these authorized dealers to make the calls and move the products. The products get into the homes when VMS or ISI sells a monitoring contract, and that's the third level. The monitoring company is Monotronics. They were a defendant in this case. That piece of the case I just said. When Monotronics sells the monitoring contract, that's when the dealer gets paid. As I understood it, and correct me if I'm wrong, the manufacturers were paid, the downstream distributor, or at least the first tier, took title to the product. Is that not correct? I believe that's correct, Your Honor. So they already have title. How does title not transfer upon payment? Were they not paid? They were paid. They were paid when the first tier distributor took title. That's correct, Your Honor. That, I think, is kind of the point, that they've been paid for the product. They have been paid for the product, Your Honor. So to say that they don't get paid unless the product goes into people's homes would not seem to be correct. They're taking title to the product. That is correct. But this is an ongoing course of conduct and an ongoing relationship between these companies that exist over a period of several years. It's not as if on one occasion a number of alarm units were sold and they just have been working off of those for time. They may take title to a product, but I guess your contention is that the quantity is impacted by the marketing tactics that are being allegedly utilized by the dealers. That's exactly correct, Judge Diaz. That quantity is going back and forth on a regular basis. If they're not out there making these calls, they have no one to sell these products to. They are not getting a benefit from the product. Let me ask you about that. So with respect to what my concern about this case is, it seems to me that there is no dividing line as to when a distributor or manufacturer crosses the line and incurs TCPA liability. You have one complaint regarding a dealer. Is that enough? Your Honor, yes. I believe that one complaint could be enough, and here's why. In this model, in telemarketing, calls that are going out are going out to hundreds of thousands or millions of people en masse in exactly the same way. These are prerecorded calls. These are calls that are based on scripts. And so you have very good reason to believe when one call is going out with a problem. It's just like if you manufactured a million widgets that were all identical and you knew there was a problem with one of them, that would be enough to cause. Under your theory of the case, if there's one complaint, the manufacturer has to cease all contact and interaction and end the commercial relationship with the dealer. That's not our theory of the case at all, Your Honor. I'm simply not conceding that one complaint couldn't be enough. Fortunately, in this case, that's not the situation that we have at all. In this case, the record is replete with a number of complaints. The record is different with respect to these two manufacturers. I think the record with respect to Honeywell appears to be stronger, but not so much with respect to UTC. Well, I think the record is certainly different as to the two defendants, but the evidence that we have is absolutely sufficient as to both of them. Well, the problem, especially with Honeywell, is that there were ongoing communications with legal staff about the problems here and assurances that they were being taken care of. So one of the bases for a theory of ratification is that in order for it to apply, the person to be bound by it has to be aware of all the material facts. And here you have at least efforts on the part of Honeywell to resolve the issues that were communicated in the complaints. And you have some other problems as well in that you have contract language which specifically imposes on at least the first-tier downstream dealers to comply with the law. I'm glad we're getting to that because my time is already running very short. But this is an absolutely critical issue. First of all, the standard under the restatement is not that the imputative principle has to have knowledge of all the material facts. The principle may also ratify if they have knowledge that would have led a reasonable person to investigate further. So it's not necessary that they know every single fact about what's going on. Here, the evidence, which unfortunately I don't have time to go through completely, is created more than enough of a reason for a reasonable person to go on and investigate. They had numerous complaints over a period of many years. Second of all... How long were the contracts? Which contracts? How was the contract with Honeywell? I believe that a new contract was signed in the midst of the record here, but I think the contracts generally lasted for a couple of years. Okay. I'm sorry. Go ahead. What's important to understand about this is agency, and this court has said over again that the scope and existence of agency is generally a factual issue. It's very bound up in inferences and conduct. And disclaimers, language of contracts, those aren't the things that decide agency. In this case, you have plenty of disclaimers, but here's what happened when UTC got complaints in 2008. They got three complaints in 2008, describing exactly the kind of illegal calls that the nameplate stuck in this case. They were filtered up to UTC executives by the global PR leader for UTC. This is at JA 1904. The PR leader for UTC sent this to a number of executives at UTC, including UTC's general counsel, and the response from UTC's executive was, quote, go PR somebody and leave us alone. We're trying to sell something. But didn't they terminate their contract with VMS within a year of receiving complaints? No, Your Honor. We're talking about UTC and VMS. They received their first complaints in 2008. The contract with VMS wasn't terminated until 2012. What about the fact that their contract stipulated that they were independent contractors and self-authorized dealers? Once again, agency... You're saying that's irrelevant? That is irrelevant. The ratification, I'm sorry, the restatement on agency is very clear that self-serving disclaimers in a contract are not controllable. What we look at under the restatement is the conduct, and a jury in this case needs to be able to weigh those disclaimers. You're saying it's self-serving? Why is it self-serving? I mean, everybody in a contract puts in provisions that favor themselves. So it seems to me that either you have to say it's irrelevant or you have to tell us why it isn't significant. Well, Your Honor, hit the nail on the head. Every contract in any situation like this says that you're an independent contractor. Almost no one signs a contract saying somebody working for them is going to be an agent. That's not in the record before us. But just to answer Your Honor's concern, that's why we look to the conduct. That's why the restatement is conduct-focused. So you're saying it's irrelevant what their contract provides? It is a relevant factor, Your Honor. I'm not saying that it's irrelevant, but it must be weighed against what actually happened. Words alone are not enough to keep you from ratifying that. I think the question, there's a totality here because at least, especially with respect to Honeywell, there were over the period of the contracts expressions of concern and ultimate termination. I think you have to realize the untenability of saying one complaint is enough because there has to be some exploration and attempt to address the problem. I suspect UTC and Honeywell would have been at legal risk if they terminated on the basis of one complaint. So there's some passage of time that's implicit in that. And at least certainly with respect to Honeywell, efforts were made to address the problem before the ultimate termination. If I may respond to that, Your Honor, what we have in the record, and when Honeywell and UTC put forth their best evidence in their brief of how they supposedly repudiated and disciplined these defendants, when you look at those JSAs... But they didn't discipline the defendants. I'm sorry, discipline the dealers. How did they discipline the dealers other than by terminating the contract? There are many intermediate, progressive disciplines common. For example, on the first complaint, maybe you would have a conversation. Is this in the record? Because there is evidence in the record that they had the conversations. But what action would have been sufficient, as you view it, to express repudiation? For any action at all, Your Honor, any effective action at all, the record is nothing but words. They said that they strongly disciplined... So what other than discipline? So you're saying that nothing other than termination? No, Your Honor. Then what else is not words? You may suspend. You may fine. Suspend. You may require them to come in for additional training. You may require them to verify with not just words, because they say they required them to verify they were complying with the record. No, they said there were ongoing discussions, expressions of concern about the practice. And we're still in the scope of the record that the contract gives them that authority? Absolutely. They would have had the authority under the contract to fine, to suspend, to require certain remedial steps to be taken. There are many intermediate steps. And they're progressive. Yes. There could be progressive steps after the first complaint. And that's why I think the Court need not be concerned with the idea that somehow one complaint is going to create this situation. We tried a case in Greensboro, this time last year, under the TCPA involving vicarious liability. And the entire theory of that case that went to the jury was the defendant there had a dealer who was violating the law. And every time the dealer violated the law, they would write them a letter that said, please stop violating the law. And they would put it in a drawer. But at the same time, just like this case, there was evidence that in addition to just writing a form letter, and what you have to compare in this case is they would say, stop that. But then they would also go out and they would extend them credit. Mr. If you want to finish your thought, you have some time for rebuttal. I'm not cutting you off mid-sentence. It's just like a two-minute warning. Thank you. I understand that, Judge. And I think much of this may be a little bit clearer on rebuttal. But I think it's important to understand, just like the case we tried. That was in front of Judge Eagles. It was called Krakauer v. Dish Network. Just like in that case, the jury has to be able to weigh what the defendants say, please stop this, please don't do this, we really don't want you to do this, versus their actual conduct in giving awards to these companies, extending them credit. But in one situation. Thank you. You're trespassing on your two minutes. Thank you, Your Honor. Ms. Walquist? Yes, Your Honor. Good morning. Becca Walquist for United Technologies Corporation Fire and Security. Could you speak a little more directly into the mic, please? Yes, is that better? That's better, thank you. Your Honors, Mr. Donovan just said a few things that were either outside of the record or incorrect that I would like to address first. First, when describing what he calls the model of distribution of products and how they end up in consumers' homes, he said the only way that UTC gets its equipment into homes is through telemarketing. And that is absolutely not the case. It's not in the record anywhere. In fact, as plaintiffs know, of all of the 28,000 businesses that UTC was aware of that sell its products, often through door-to-door sales, often online, I think we were only aware of seven that might have employed any kind of telemarketing and had given that to plaintiffs in discovery. So this is not a system that is dependent on telemarketing, as plaintiffs are saying, and that's not in the record. Mr. Donovan also spoke about complaints that he said that UTC received in 2008. I should point out that UTC did not acquire from GE the rights to make GE-manufactured equipment until 2010, and I believe that the complaints he's talking about were at GE and not at my client, which did not start doing GE equipment in 2008. So that four-year window for termination was not accurate? Right. We acquired the GE brand and the right to use that brand and equipment in 2010 and acquired with that the authorized dealer relationships that GE had in place with a lot of companies like BMS. And then over the period of taking over that business, starting to work with those relationships, which were not direct relationships because UTC only sold to distributors, 35 different distributors. The distributors would then sell it down. And you're right, Your Honor, that the title did pass to distributors. That was the only money that UTC would make was through that sale. And then upwards of 28,000 businesses purchased from those distributors and would use the equipment in their own businesses. So it's not something that was dependent on telemarketing. As complaints were coming in, the record is actually very strong for UTC that for the few complaints it was getting, it investigated, went back to the retailers, asked them what's going on, got assurances. We're not misusing your names, your brands. My client, even when it was getting complaints about telemarketing involving its GE trade names, could not figure out who was making the calls. They weren't tying to any authorized retailers. And as you can see in the record in the Gomez declarations, we actually filed a litigation in Washington to open up subpoenas and try to get from the telephone companies who was making calls to talk about our equipment. Let me ask you this because a lot of this that you're talking about seems to be fact-driven. Yes. I know your position is that you have to have a preexisting agency relationship in order to ratify. Let's say we disagree with you on that. The question is what's the test that we apply in determining whether a particular defendant is entitled to summary judgment as a matter of law with respect to this issue. So what's your test? Well, Your Honor, first, I mean, I think as we said in our letter about the Christensen case, we do think that there does need to be a preexisting relationship. But I think that what the trial court looked at, what the Christensen court looked at, is that relationship involves that you can ratify an act only if someone acted or purported to act as your agent. So that preexisting relationship includes implied agency as well, and it gives kind of a backdoor way for a principal to, after the fact, can create an apparent authority relationship. But there has to be something like that. There has to be some sort of agency, give and take, and some acceptance of someone acting as your agent before you can ratify. And that's why in Christensen, when looking at TCPA, the four defendants where they said they're just not ratifiable acts were defendants in that same position that the manufacturers are here. We have no relationship with who VMS hired to make the calls that the plaintiffs are complaining about. We don't even know really who those entities are at this point who actually made these initial calls. So I don't know how we could be ratifying behavior of vendors that were hired by dealers that we're not even aware of. Once a manufacturer becomes aware of complaints, are you suggesting that because of this attenuated relationship it has no obligation to do anything? Well, no, I don't think that's the case at all. I think that there's more than awareness, though. I mean, ratification has this important aspect that you have to accept the benefits. And here, none of the plaintiffs actually purchased any of the monitoring services that were being offered, so there weren't any contracts. But if you look at, I think it's important to look in the record. Is that a standing question? I'm sorry? Is that a standing question? I think it does tie into standing that the plaintiffs hear. We did raise the Spokio question. As soon as that came out with the court and ended up talking about that, he approved our request to do the summary judgment, and we went that direction instead of doing standing briefing. I thought my sense of what the district court did, and I may have misinterpreted it, is that most of the states that deal with the apparent authority, this issue, do so in the context of a relationship that existed once. And the question is how long the consequences of that relationship continue to bind the principle. Because the ratification prongs necessarily involve some sort of connection between the parties, or otherwise you wouldn't be able to ratify an act by failing to object or receive or retain benefits. Otherwise the prongs don't come into place, I guess is what I'm trying to say. Do you have a case that's more like this? The interesting thing about this case is that really before it I wasn't aware. I do a lot of TCPA litigation, and this was the first time I've been aware of arguments trying to reach this far, to go up to a manufacturer that's disconnected. The case that Mr. Donovan was just speaking about that involved DISH Network, that's more the usual situation where somebody tries to get vicarious liability, where it was a dealer of DISH Network that was providing customers to DISH. And here, as you can see in the record, the contracts that we give some sample contracts at JA 1368 to 77. If somebody accepts these calls, signs a contract with BMS or ISI or another dealer, then Monotronics would buy that contract. That's the kind of vicarious liability argument you would make for ratification. You would say Monotronics, by knowing that there's telemarketing, and by acquiring that contract and having the relationship now with the third party that have those representations made, that would be, I think, the ratification argument you would make in this case. Monotronics has decided to settle rather than fight on agency, as manufacturers did. We think, probably because of those arguments... We don't know that, do we? Yeah. But those are the kinds of arguments that we are not... UTC had nothing to do with these contracts that people are entering. There's no benefit for us to accept a tangential statement that more equipment is sold because of telemarketing. It doesn't have any proof in the record. The plaintiffs haven't made any connection there. Really, the elements of ratification don't exist, which is why, Your Honor, I think summary judgment is absolutely appropriate here. I do think that the trial court recognized the standard that plaintiffs say that he didn't want to... that he didn't apply because he actually has, in the order, quoting from another case. He talked about... and that was what was interesting about it. He says there doesn't have to be one, but if he goes ahead and acts as though there was. Exactly. So even though he said one thing, which I do think that's the right standard, if you disagree and say, no, it needs to be the other standard, he did the analysis, and I think it's the correct analysis, that you just do not have the evidence here. And this is evidence... I mean, this case was brought in 2011. All of the documents were produced well before 2015. I mean, the evidence has been in for a long time, and there's just nothing that the plaintiffs were able to put together to create something that would overcome our summary judgment motion, because here it would just be going too far. And as the amici stated, this is something that's causing a lot of concern, generally for businesses, if you were to reach this far with this tenuous of an argument to vicarious liability for hundreds of millions of dollars of TCPA violations. It's just really extreme. Thank you. Good morning, Ms. Mazzuchetti. Yes. Good morning, Your Honors. Laurie Mazzuchetti for Honeywell International, Incorporated. I'd like to start with the discovery issue, Rule 56D. It was incumbent upon plaintiffs before the district court to specify precisely the discovery that it desired to take and why that discovery was going to be pertinent or possibly create a genuine issue of material fact that would be relevant to the summary judgment motion. And that was not done here. What plaintiffs did instead is say, we want to take discovery and take depositions on our agency theory, which was the whole game as it pertained to Honeywell. I just want to rewind through the procedural history, because what had happened here is we started in the Southern District of West Virginia before Judge Copenhaver in April of 2012. Between June through September, we were completing vigorous discovery where Honeywell produced documents. Honeywell produced for depositions four different corporate representatives on 14 topics, 13 of which related to agency. Honeywell also participated in depositions of ISIs, principals, and representatives. And if you look at the Marshall Declaration, which is the Rule 56D, or purports to be the Rule 56D declaration, what they say is we have this whole record here of these 124 exhibits, and somewhere in there is something we want to ask a Honeywell deponent about. If you look at those 124 exhibits, 42 of them relate to Honeywell. The remainder relate to UTC. Of those 42, five are deposition transcripts, the depositions they're complaining that they did not take. They actually did take. They took them of four different representatives, as I said, and ISI representatives. Ten of those documents were shown as exhibits at those depositions. And the remainder were produced by 2014, just around the time that we were entering into this MDL. The only reason why there were six months or eight months or whatever plaintiffs are representing to the court were left in discovery is because there were, by my count, it was 22. By Judge Bailey's count, it were 30 cases that were involved in this MDL. We were so far ahead that our discovery was all but complete. So stay or no stay, there was no push of discovery. Prior to a stay being entered for the Campbell, Ewald, and Spokio decisions that we were awaiting from the Supreme Court, the plaintiffs weren't asking us for any more discovery because they didn't need it. And what I found compelling or interesting in their brief is they said they sought 30 depositions and one deposition of Honeywell. I don't know who that is. The lower court didn't know who that is, and your honors don't know who that is. They said they sought to depose or why they needed to depose it having had completed all of that discovery. Can I ask you a question about the merits? Sure. As plaintiffs characterize the evidence with respect to your client, they allege or suggest that despite receiving all these complaints about ISI, that your client literally was stumbling all over itself to keep their relationship together, and that that is the evidence of ratification that needs to go to a jury. What's your view of that? I think the record speaks for itself on this, and if you look at the timeline, the plaintiffs present this timeline of when did the complaints commence and what was Honeywell's reaction to those complaints. So plaintiffs contend that the complaints began in 2011, and this was before the district court, that the first complaint related to what appeared on a caller ID and had nothing to do with unsolicited telemarketing calls. So that's off the table. There were not unprecedented complaints in 2011. The relationship with ISI began in 2005. The first complaint that's in the record that Honeywell received, we are now in April of 2012, and Honeywell's reaction was to call ISI to the carpet and say what is going on here because we don't tolerate this. There was a concern of whether ISI was using Honeywell's name in its communications with consumers, and Honeywell said let me see your script. We want to review it to make sure that you're not, and assurances were provided all along by ISI that if there was a problem, they were fixing it. They told Honeywell that the complaints at issue arose because of a marketing partner that they were dealing with, and they terminated that marketing partner, so problem solved. They also told Honeywell in the summer of 2012 that they had hired a reputable compliance vendor by the name of Compliance Point that's known in the industry to be up to snuff and best in class on TCPA compliance. So by summer of 2012, they are telling Honeywell if there is a problem, we are fixing it, and this will not recur. Now, the complaints or the calls at issue in this litigation of Diana Mae occurred between March 2012 and May 2012. So all of this conduct that we're not reacting to complaints quickly enough occurred after the calling period. So even if Honeywell had not reacted quickly enough, the complaint says to Diana Mae, which is the plaintiff that is trying to tie calls to ISI, albeit that they were made by another party named Data Guru that we discovered in Discovery, those calls were finished. But even if they weren't, the evidence that Judge Bailey looked at was Honeywell was reacting responsibly and was saying, what say you, ISI, about what's going on here? This was not lip service. These were executives calling on Sunday mornings to say, explain yourselves. Now, the fact that a company that is in the business to sell its products is trying to continue to sell products does not create anything out of the norm here. There are sales folks, like they pointed to some emails of a sales folk saying, congratulations, it looks like you guys are doing well. You bought a lot of our stuff in October 2012. That's all garden variety, what you would expect to see between a manufacturer and somebody purchasing its product. But on the specifics of the complaints and what was going on with respect to the alleged telemarketing, Honeywell was all over ISI. So I'd like to turn to the benefit, all the benefit that Honeywell was expecting to gain based on the relationship with ISI after the product was purchased. That was sort of my first question. I was trying to quantify or get some sense of what benefit, what reasonably quantifiable or manageable benefit could be found in this record when the first tier consumer takes title and the manufacturer gets compensated big. So obviously there may be an incentive to sell more product, but that's kind of, that's a bit ephemeral. I agree, Your Honor. And if ISI did anything or if ISI or VMS did anything, is that they were creating the market that enabled manufacturers like Honeywell and others to put product into the chain of commerce. But for Honeywell's perspective, once their product was purchased, whether ISI resold it, gave it away, or dropped it in a landfill, we realized all the benefit that we were going to get no matter what they did with it. And this is borne out by the fact that this relationship started in 2005. From 2005 to April 2012, things were proceeding along without incident. So, you know, that market was created. And mind you, if ISI was not purchasing product from Honeywell, they could go buy it from anybody else that they desired and continue on with their marketing practices as they were. So that was not something that we had control of. So the last point I would like to address is this notion of progressive discipline. I don't know where that comes from. It was not part of the lower court record. It's not in our contract. Okay. Thank you. Thank you. There's no further questions? Thank you. Thank you. Thank you. I think what we just heard from Appalachie's counsel would make a fine closing argument with respect to the facts. But we're here on the summary judgment standard. Is there, but in that period of time when you were getting, when you were seeking discovery, do we have anything in the record other than your speculation about additional benefit? Anything? Is Your Honor asking again about quantifying the benefit? Yeah. Do we have any, have you put forward anything seeking to quantify a benefit generated by the telemarketing, which is the standard? Yes, Your Honor. They're correct that the dealers take title to the product. But then calls are made. The products are sold. Do you have, can you point to any evidence that attempts to quantify the net result? I understand that you're telling me and you keep telling me, and I'm trying to tell you that's not helpful, that if the downstream people keep selling, then they keep buying from the manufacturer. But I'm trying to get beyond that to, for purposes of ratification, can you point to anything in the record that helps me understand what benefit the UTC and Honeywell derived from the, is the impermissible telemarketing? Yes, Your Honor. Without the impermissible telemarketing, they don't sell any more products to IMS. You don't know that. I mean, can you give me, and that still isn't, that doesn't help me quantify. So you can't be telling me that every sale they made is attributable to impermissible telemarketing. No, Your Honor, and I don't have to establish that. Well, is there any evidence as to whether there's any purchasing that is attributable to telemarketing? Or are you going on this supposition that there just must be? The only type of marketing that I, yes, Your Honor, the only type of marketing that ISI and VMS did was telemarketing. Okay, over and above the benefit, over and above the price of the monitoring system, because it has to be value-added, not just the system. Yes, Your Honor. The entire, again, they are not selling these products. The only benefit they're getting is that they're going back and selling them. And they get it when the product is sold. And this relationship is ongoing, as they said, from 2005. So it's not as though in 2005 they took title to all of the Honeywell products they were ever going to have. They continue to sell and get paid for the product. No one is arguing for it. I mean, that's not the question. Your Honor, I think that is the basis for our argument that they've accepted a benefit. And I think it's important to understand that all of these distinctions that were drawn, there are steps removed, we're manufacturers, we're not sellers. We're not asking for any per se rules on anything like that. We're just asking to have an opportunity to go back and apply the principles of ratification,  What additional information did you want from Discovery? And why did you not have a previous opportunity to obtain on Discovery? And what do you want now to go to? Sure. We received 108. There was discussion about the depositions that were held before. First of all, it's very important to point out that Judge Keeley, in denying effectively the same summary judgment motion before the case got transferred, pointed out on this issue that her Discovery Order, with respect to UTC in particular, limited the ability to find facts specifically on ratification. That is a specified reason, which is what Rule 56D requires, which is in paragraph 4 of the Marshall Declaration. Judge Keeley said, This Discovery Order didn't allow you to take depositions that touched on the important issues of ratification before. The standard that Judge Bailey imposed and the standard that counsel is asking for today is a different standard. The rule requires specified reasons, which we provided. What counsel is asking us to do is to provide the specific evidence that we think we would have adduced. Well, you do have to say what you think you're looking for. That's correct, Your Honor, and we did do that. We specifically said we need to take these depositions that deal with ratification, which we weren't allowed to take before. We said there are 183,000 documents. There are affidavits. They relied several times on affidavits of Gomez in their summary judgment opposition. We didn't get to depose Gomez. Anyone knows when you get 183,000 new documents, that is going to lead to the need for more depositions, the need to examine those documents, the context of those documents, to ask about what those documents meant. We didn't have an opportunity to do that. At the very least, we ought to be able to go back to the district court and have that opportunity. Thank you very much. Thank you very much. We'll come down and greet counsel and go directly to the next case.
judges: Allyson K. Duncan, Barbara Milano Keenan, Albert Diaz